56330-5/tfb[20384665]

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 08-22111-CIV COOKE/BANDSTRA

AUGUSTO MEDINA,

      Plaintiff,

vs.

UCEA, et al.,

      Defendants.

_____/

## DEFENDANTS' MOTION FOR FINAL SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Defendants, UNITED CHRISTIAN EVANGELISTIC ASSOCIATION, et al.[1], pursuant

to Federal Rule of Civil Procedure 56 and Local Rule 7.5 for the Southern District of Florida,

move this Court for entry of final or summary judgment in their favor, and state as follows:

## PREFATORY STATEMENT

This frivolous action is an extortionate conspiracy concocted by Medina and former

UCEA Office Manager, Clara Ortiz. In the pending Fifth Amended Complaint, Medina alleges

claims of (1) battery, (2) intentional infliction of emotional distress, (3) negligent

retention/supervision, (4) sexual harassment under Title VII and the Florida Civil Rights Act,

and (5) retaliation under Title VII and the Florida Civil Rights Act ("FCRA").[2]

---

[1] All defendants will be collectively referred to as "Defendants". The corporate Defendants will
be collectively referred to as "UCEA". Reverend Frederick Eikerenkoetter will be individually
referred to as "Rev. Ike"

[2] Medina also alleged related counts of assault and retaliation based on failure to rehire which
were dismissed under Rule 12(b)(6).

CASE NO. 08-22111-CIV COOKE/BANDSTRA

Medina's allegations of recurrent sexual battery and retaliation are preposterous, particularly when viewed against his absurd justification for subjecting himself to the alleged abuse.  Other than Medina's own patently false testimony, there is absolutely no evidence that the acts occurred as he alleges.  When the record is viewed as a whole, no reasonable jury could believe Medina's outlandish claims.  Therefore, there is no *genuine* issue of material fact, and final summary judgment should be granted in favor of Defendants on all counts.

## STATEMENT OF FACTS

In accordance with S.D.Fla.L.R. 7.5, Defendants have simultaneously filed a Statement of Facts and adopt and incorporate by reference those facts as though fully set forth herein.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  An issue is only "genuine" if a reasonable jury could return a verdict for the non-moving party based on the evidence in the record. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A party seeking summary judgment initially bears the burden identifying those portions record that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof, the moving party's initial burden is met by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325.  After

2

CASE NO. 08-22111-CIV COOKE/BANDSTRA

the moving party meets its burden, the adverse party must make a factual showing "sufficient to establish the existence of an element essential to that party's case." *Celotex,* 477 U.S. at 322.

The court must view the evidence in the light most favorable to the non-moving party and draw all *reasonable* inferences in favor of that party. *Anderson,* 477 U.S. at 255.  This entails "cull[ing] the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." *Jeffrey v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995).

"A court need not permit a case to go to a jury when the inferences that are drawn from the evidence, and upon which the non-movant relies, are 'implausible.'" *Cuesta v. School Board of Miami-Dade County*, 258 F.3d 962, 970 (11th Cir. 2002) (citations omitted).   Expounding on this principle, the United States Supreme Court recently explained,

> [w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.  *Scott v. Harris*, 127 S.Ct. 1769, 1776 (2007).

Thus, "where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Id*. (citation omitted).

## MEDINA'S STORY IS IMPLAUSIBLE, CONTRADICTED BY THE RECORD, AND NO REASONABLE JURY COULD BELIEVE IT

**A.    Rev. Ike and UCEA --** Reverend Ike was born June 1, 1935, in Ridgeland, South Carolina.  For over 40 years, Reverend Ike has been Minister, Teacher, Motivator, Evangelist, Counselor, Mentor, and Pastor to millions of people.  He is the Founding Minister and President of UCEA, a not-for-profit Church which provides religious services including educational,

CASE NO. 08-22111-CIV COOKE/BANDSTRA

social, remedial, anti-substance abuse, financial management, youth, recovery, rehabilitation, and many other programs.  **(Statement of Facts, hereinafter "SOF", ¶ 4)**

B.     **Augusto Medina --** Medina is educated, shrewd, and utterly dishonest.  Further, Medina is promiscuous and has absolutely no problem engaging in casual, meaningless sex with men. He goes to gay bars and has sex with men he meets on the street, whose names he cannot recall. **(SOF ¶ 6)**.

In Cuba, Medina completed 12th grade followed by two years of study to become a teacher.  **(SOF ¶ 9)**.  In 1995, around age 27, Medina demonstrated the cunning and fortitude to extricate him from an abusive situation by fleeing Cuba due to the political situation.  **(SOF ¶ 9)**.

In pursuit of his financial ambitions, Medina has engaged in intricate fraudulent schemes and has lied on trial, in deposition, and in sworn statements under criminal penalty.

<u>**An oath means nothing to Medina**</u>:  On December 18, 2006, Medina testified at a trial before Judge Graham in a related declaratory action.  Medina's testimony was blatantly false:

> Q.     **And when you filed your 2004 tax – strike that.  Do you pay taxes?**
> A.     **Yes, yes.**
> Q.     **And did you file a tax return for the year 2004?**
> A.     **Yes.**

**(Graham Trial, p. 55, l. 10-14; SOF ¶ 12)**.  Medina kept up this charade during his deposition:

> Q.     **And my question to you is did you report any of the income that you made on these various jobs that you did from July of '02 to July of '03 to the federal government?**
> A.     **I think so. …**
> Q.     **We are still missing [your tax returns for] the years 2000, 2002, 2003 and 2004.  Do you know where those tax returns are?**
> A.     **I might have them at home.**
> Q.     **If they are not in your home, would they be at H & R Block?**
> A.     **I suppose so.**

CASE NO. 08-22111-CIV COOKE/BANDSTRA

**(Medina Depo, p. 215-217; SOF ¶ 12)**. Only after Defendants obtained an Order compelling Medina to produce his tax returns did the truth come to light.  On April 13, 2007, Medina finally admitted under oath that he did not file income tax returns for 2002, 2003, or 2004. **(SOF ¶ 12)**.

**Medina has repeatedly misrepresented his income and violated federal law to fraudulently obtain mortgages**[3]:   On April 7, 2004, just before leaving UCEA, Medina orchestrated an intricate fraudulent scam to purchase a home for $272,500.  **(SOF ¶ 13)**  To pay for the home, Medina fraudulently obtained a $218,000 mortgage.  The loan application stated as follows:

> *I/We certify that the information provided in this application is true and correct… and acknowledge my/our understanding that any intentional or negligent misrepresentation(s) of the information contained in this application may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq…*

**(Medina Depo #2, Ex. 21)**  Nevertheless, Medina falsely verified that he earned $4,300 per month at UCEA, equating to $51,600 per year.  Medina never earned $4,300 at UCEA in any month; in fact, the most he earned in any year was $15,284.50.  **(SOF ¶ 25; Medina Depo, Ex. 3)**  The remaining $58,000 of the purchase price was conveyed to Medina in a fraudulent gift of equity for which Medina falsely certified that he was the seller's brother.[4]  **(SOF ¶ 13)**.

The above transaction was not an isolated fraud.  Medina testified in deposition that after he left UCEA, he earned approximately $3,000 per month from all sources.  **(SOF ¶ 14)**.

---

[3] As detailed below, Medina's financial condition is absolutely critical in this litigation because he alleges he subjected himself to the alleged sexual battery and retaliation so he could keep earning $10 her hour at UCEA.  **(Medina Depo, p. 76-77)**.

[4] Under the law, a gift of equity in real estate can only be given between relatives.  By lying about his relationship to the seller, Medina illegally avoided both a down payment and private mortgage insurance.

CASE NO. 08-22111-CIV COOKE/BANDSTRA

Contrarily, Medina verified in multiple mortgage applications that his monthly income was between $8,900 and $9,500 per month.  **(SOF ¶ 14)**.

Moreover, at deposition, Medina was asked to set forth his entire employment history. He failed to disclose that he worked for Royalty Lender, Inc.[5]  But in his mortgage applications, Medina certified that he began working as a loan originator for Royalty Lender, Inc. in September 2002 (which happens to be when he left UCEA the first time). **(Medina Depo #2, Ex. 49 and 50)**.  Medina told Ortiz that he was leaving UCEA in 2002 to pursue a position as a mortgage lending officer.  **(SOF ¶ 29)**.  Incredibly, he denied any recollection of working as a mortgage loan officer around that time.  **(Medina Depo, p. 65, l. 12-p. 69, l. 2)**.  Medina's own testimony demonstrates his bold lies about his employment history.  Medina unequivocally testified in his initial February 2007 deposition, "**I am a loan officer**".  **(Medina Depo, p. 199, l. 14; p. 200, l. 9-12)**.  Contrarily, in his April 2008 deposition, he testified, "**I was not a loan officer." (Medina Depo #2, p. 75, l. 17-25)**.

Medina's testimony about his employment history is not only contradictory but also blatantly false.  In his second deposition, Medina was confronted with a deposit into his checking account of $9,852.30 on October 11, 2002—after he began working as a loan officer.  **(Medina Depo #2, Ex. 57)**  When confronted, Medina provided the following unbelievable testimony:

> Q.    **Do you know where that money came from?**
> A.    **No, I don't remember.**
> Q.    **Do you know whether it came form any monies you received from Royalty Lending or working for mortgage lenders?**
> A.    **I don't remember where it came from.**

---

[5] Also, in his initial answers to interrogatories which were verified on June 3, 2005, he did not mention any employers after UCEA.

CASE NO. 08-22111-CIV COOKE/BANDSTRA

**(Medina Depo #2, p. 140, l. 20-p. 141, l. 2)**. It is absolutely inconceivable that Medina could have forgotten how he obtained that much money at a point in his life where he felt he needed to subject himself to repeated sexual battery and retaliation for $10.00 per hour.

The evidence is clear: after allegedly being sexually battered and mistreated by Rev. Ike but before returning to UCEA for his second period of employment, Medina was making a substantial amount of money in the mortgage business. Incredibly, Medina also claims he has no idea where he put more than $30,000, which he netted from the sale of his apartment in February 2003, just months before returning to work for UCEA. **(SOF ¶ 55)**. He testified,

> **Q.** **And that refreshes your recollection that you received a profit of about that amount [$30,000] on or around February 28, 2003, correct?**
> **A.** **Okay, yes.**
> **Q.** **And do you know what bank account you deposited that sum of money in?**
> **A.** **I don't remember.**
> **Q.** **You closed down the Washington Mutual account in February of '03 and we do not have any documents from you reflecting what your checking account was between then until much later with the Bank of America [which was opened in January 2005].**
> **A.** **Yes, I don't know. I don't remember where I put that money.**
> **(Medina Depo, p. 59, l. 15-p. 60, l. 3)**

Based on these transactions alone, Medina received income of at least $40,000 between his two periods of employment with UCEA. He never reported it to the IRS. His "amnesia" about where he was banking and where he put $30,000 was a ruse to prevent Defendants' from learning how much he was actually earning. In spite his large income, he returned to UCEA just a few months later. If he had been abused as he alleges, he never would have returned. Also, the claim that he allowed himself to be the subject of sexual harassment because he needed the money is obviously false.

CASE NO. 08-22111-CIV COOKE/BANDSTRA

C.     **Clara Ortiz --** Clara Ortiz was the office manager for UCEA in Bal Harbour from March 2001 until July 2007.  Ortiz interviewed, hired, and supervised Medina while he worked for UCEA.  During a trial in December 2006, to determine insurance coverage for this case, Ortiz testified as the UCEA representative.  Medina was an adverse witness.  But in deposition, she began recanting prior statements and gratuitously declaring that Medina was an honest person. **(Ortiz Depo, p. 103, l. 1-3)**.  Through discovery, Defendants uncovered that this lawsuit is an extortionate conspiracy hatched between Medina and Ortiz.  This is Ortiz' third conspiracy.

**Ortiz's first fraudulent conspiracy:**  On September 19, 2001, unbeknownst to UCEA, Ortiz was convicted of Grand Theft and Organized Fraud.  Ortiz was sentenced to one year of community control, followed by five years of reporting probation.  **(SOF ¶ 18; D.E. 37, Ex. H)** Ortiz's conviction stemmed from an organized insurance fraud scheme that took place between January 1996 and April 1999.  Forged claim forms totaling $97,490 were submitted by Jackson Memorial employees to Blue Cross Blue Shield.  Ortiz invited others to participate in the scheme and told them that they could make extra money by filing false claim forms.  One defendant stated that Ortiz had scripted an alibi in case of an insurance fraud investigation so all their stories would be consistent.  **(D.E. 37, Ex. I)**

Ortiz concealed her criminal conviction from UCEA by petitioning the court to permit her to verify her employment through pay stubs.  Further, she hid from the court that her position at UCEA entailed routinely handling money. **(D.E. 37, Ex. J)**

**Ortiz's second fraudulent conspiracy:**  Ortiz's second known fraudulent conspiracy is significant because she joined Medina in this fraud.  As noted above, Medina scammed to purchase a home in Miami.  In a Verification of Employment Form, Ortiz falsely certified that

CASE NO. 08-22111-CIV COOKE/BANDSTRA

Medina had been employed since March 2001, when he actually started in September 2001 and did not work from September 2002 and July 2003.  Ortiz certified that Medina earned $1,119.23 per week, but this too was an absolute lie.  Ortiz also lied by verifying that Medina earned $52,325.46 in 2002 and $55,289.96 in 2003.  **(SOF ¶ 19; Medina Depo #2, Ex. 24)**.  His actual earnings were $15,284.50 in 2002 and $3,147.46 in 2003.  **(Medina Depo, Ex. 3)**

In December 2004, Medina sold the same home to Ortiz, netting about $70,000 which he failed to report to the IRS.  After the sale, Medina continued living in the home and paying the mortgage.  Ortiz gave Medina Power of Attorney, and when they sold the home in March 2006, Medina signed the Warranty Deed for Ortiz.  Medina kept the entire $62,865 profit and testified that Ortiz let him keep the money because she is a "Good Samaritan".  **(SOF ¶ 20-21)**

**Ortiz's third fraudulent conspiracy:**  This lawsuit is yet another fraudulent conspiracy devised by Medina and Ortiz.  While Medina was working for UCEA, there was lawsuit against UCEA by a former employee, Andrew Brown.  The allegations in that case pertained primarily to false arrest, but there was also one false allegation of sexual harassment.[6]  **(11/19/01 Rev. Ike Aff.)**  In November 2001, Defendants filed a Motion for Summary Judgment which ultimately led to a settlement for less than litigation expenses in January 2002.  **(Andrew Brown Settlement Stip.)**  Around that time, the settlement papers were faxed to the UCEA location in Bal Harbour where Ortiz and Medina worked.  Medina and Ortiz were responsible for picking up faxes that came into the Bal Harbour office of UCEA. **(Medina Depo, p. 276, l. 21-23; Ortiz**

---

[6] Andrew Brown falsely alleged that the hostile work environment became so terrible that he had to procure a male prostitute whom he left alone with the Reverend.  In fact, the male prostitute swore that he did meet alone with the Reverend who talked to him about his family, his schooling, and going to church.  There were absolutely no sexual advances at all.  **(Alejandro Rubio Aff.)**  Thereafter, the claim settled for less than litigation expense.

CASE NO. 08-22111-CIV COOKE/BANDSTRA

**Depo., p. 34 and 76)**.  Medina and Ortiz would have learned that Andrew Brown had received money for filing a lawsuit against UCEA.  This was the catalyst behind this extortionate scheme.

Upon being confronted with the voluminous evidence of their relationship, Medina admitted that he had an ongoing personal and business relationship with Ortiz.  **(SOF ¶ 17)** Medina and Ortiz even opened a joint bank account.  **(SOF ¶ 17)**  The account remained open when Ortiz gave testimony as the UCEA Representative in the declaratory judgment trial before Judge Graham to determine coverage for this case.  Medina was an adverse witness at trial.

Also, unbeknownst to Defendants, at critical times throughout this litigation, Medina and Ortiz have been in close telephone contact, including over 100 calls around the time of Clara Ortiz' deposition and Rev. Ike's deposition.  **(SOF ¶ 22)**  Medina initially lied by testifying that he never spoke with Ortiz about this case prior to her termination by UCEA in July 2007.  Upon being confronted with Ortiz' phone records which showed ten telephone calls between them the day after her deposition, he reluctantly conceded that they discussed this case.  **(SOF ¶ 22)**

Astoundingly, Medina testified that he could not remember whether Ortiz came forward as a witness when he filed his second EEOC Charge of Discrimination in late-2007.  **(Medina Depo #2, p. 16, l. 23-p. 17, l. 1)**.  Medina simply cannot be believed.  The record overwhelmingly establishes that this action is a fraudulent conspiracy.

## NO REASONABLE JURY WOULD BELIEVE MEDINA'S STORY

Medina worked for UCEA as a chauffeur, messenger, general assistant, valet, cleaner, and handyman on an "as needed basis" during two separate periods:  (1) from September 2001 until around September 2002 and (2) from July 2003 until April 2004.  During these two periods, Medina claims that he was sexually battered by Rev. Ike seven or eight times, although he does

CASE NO. 08-22111-CIV COOKE/BANDSTRA

not recall the exact number.  **(SOF ¶ 24-33)**  The allegations of sexual battery include forced masturbation and oral sex.  **(SOF ¶ 36-40)**  Medina swore that he voluntarily engaged in the alleged sexual acts so he would not lose his job.  **(7/4/06 Charge of Discrimination)**.

Medina also claims Rev. Ike retaliated by ruining work he previously performed; unreasonably criticizing Medina's work to demoralize him; forcing him to work in the heat without regard to his health; increasing his work load; and threatening to withhold his pay if Medina did not perform sexual acts. **(Plaintiff's Fifth Amended Complaint, D.E. 3-2, ¶ 127)**.

No reasonable jury could ever find that an educated adult—like Medina—would subject himself to such abuse during two separate periods of employment that spanned more than two and a half years.  No person would continue working for $10.00 per hour under those conditions.

During the alleged sexual battery, Rev. Ike was in his late-sixties.  He was 5'9" tall and somewhat overweight.  **(SOF ¶ 5)**  Medina was in his mid-thirties.  He was 6'2" tall and about 180 pounds.  He was physically fit, and he was not afraid of Rev. Ike.  **(SOF ¶ 7).**

Medina's provided a completely contrived justification for subjecting himself to the alleged abuse.  He testified, "**I had a mortgage to pay, a home and a family in Cuba to support.**"  Further, he claimed, **"…if I don't work, I don't eat and if I don't work, I will be out on the street.  I have no one.**" **(SOF ¶ 52)**

Medina was not an executive making $50,000 per year—even though he claimed to be in his mortgage application.  Medina only earned between $9.00 and $10.00 per hour at UCEA. Medina had worked in the restaurant and hotel business for many years, earning comparable income.  **(SOF ¶ 10)**  He conceded that he could have obtained another position earning just as much money within a very short period of time.  **(SOF ¶ 53)**  Additionally, Medina clearly had

CASE NO. 08-22111-CIV COOKE/BANDSTRA

knowledge and experience in the mortgage industry which was booming.  If Medina was actually abused, he would have left after the first incident and never returned.

Also, Medina's assertion that he had a mortgage to pay is bogus.  The evidence clearly shows that Medina did not have a mortgage to pay from February 2002 until April 2004, when all but one of the sexual batteries allegedly occurred.  **(SOF ¶ 55-56)**.

Additionally, Medina's claim that he subjected himself to sexual battery so he could support his family in Cuba is simply false.  As noted above, he acknowledged that he could obtain an equal paying position in a short time.  Further, documentary evidence establishes that he only sent an average of $200 per year to Cuba.  **(SOF ¶ 57)**.

Medina also had a homosexual friend named Elsio Betancourt.  Incredibly, after all the alleged sexual battery and retaliation, instead of seeking Betancourt's help to escape the alleged abuse, Medina obtained a job for him as Rev. Ike's personal assistant.  **(SOF ¶ 43)**.  Perhaps most absurdly, Medina filed a subsequent related action in which he alleged that he wanted to return to work for UCEA.  **(SOF ¶ 44)**  These facts are irreconcilable with Medina's claims.

Ultimately, based on the record, not a single material allegation of Medina's can be believed.  Even when the facts are viewed in a light most favorable to Medina and all reasonable inferences are drawn in his favor, no reasonable jury could accept Medina's ridiculous claims.  Therefore, there is no genuine issue of material fact, and summary judgment should be granted.

## MEDINA HAS NO DAMAGES

Significantly, Medina lost no income, benefits, or earning capacity as a result of the alleged acts.  He never received any psychological treatment and never even had an evaluation or any medical treatment attributable to the alleged abuse.  His claimed "intangible" losses are

CASE NO. 08-22111-CIV COOKE/BANDSTRA

specious given his false allegations of abuse and his promiscuous history of having casual sex with men he meets on the street, whose names he cannot remember.  **(SOF ¶ 2 and ¶ 6)**

## PARTICULAR COUNTS

**BATTERY:**   In Florida, battery is "the infliction of a harmful or offensive contact on another with the intent to cause such contact or the apprehension that such contact is imminent." *Quilling v. Price*, 894 So.2d 1061, 1063 (Fla. 5th DCA 2005)(citation omitted).

There is no cause of action for consensual sexual battery.  *See Lyons v. Williams*, 91 F.3d 1308, 1311 (9th Cir. 1996).  Consent is willingness in fact for conduct to occur, and it may be manifested by action or inaction and need not be communicated to the actor.  *See* Restatement (Second) of Torts § 892.  If words or conduct are reasonably understood by another to be intended as consent, they constitute apparent consent and are as effective as consent in fact.  *Id.*

Moreover, Florida law does not support the invalidation of consent based on a claim of "economic duress".  *See NN Investors Life Ins. Co. v. Professional Group, Inc.*, 468 So.2d 532, 533 (Fla. 3rd DCA 1985); *Reavis v. Slominski*, 551 N.W.2d 528, 542 (Neb. 1996)(holding that the lower court erred in refusing to instruct the jury that "A threat of economic duress such as the threat of future loss of employment is not sufficient to invalidate the consent given.").

Even if Medina's false allegations were taken as true, his own testimony establishes that he consented to the sexual acts, either expressly or impliedly.  In his Charge of Discrimination, he claimed, "Because I wanted to continue to work, I masturbated Reverend Ike and provided him with oral sex when he requested that I do so."  **(7/6/04 Charge of Discrimination)**  Thus, he chose to perform the acts.  Since economic duress does not vitiate consent to sexual activity, the alleged sexual acts do not constitute battery.

CASE NO. 08-22111-CIV COOKE/BANDSTRA

Also, in the Charge of Discrimination, Medina fails to assert that any sexual battery occurred during his first period of employment. Instead, he alleges that approximately one year after he was hired, "the Reverend Ike began *requesting* sexual favors including masturbation and oral sex." Further, he claims he refused those requests. A request does not constitute battery.

Finally, even if the Court were to disregard Medina's sworn Charge of Discrimination and accept his conflicting deposition testimony, there was clearly implied consent. As to the first incident, Medina claims he was massaging Rev. Ike's legs, when Rev. lifted his towel to expose himself.[7] Medina continued massaging Rev. Ike's thighs for another two to three minutes while Rev. Ike became erect. Medina claims Rev. Ike then took Medina's hand and placed it on his penis. Everything about these allegations implies consent. Medina admits he did not object to the act before it occurred. **(SOF ¶ 36)** Even after the incident, he did not say anything to Rev. Ike or anyone else at UCEA about it. **(SOF ¶ 36)**

As to the second alleged battery, Medina conceded that he made a conscious decision to engage in the alleged sexual activity. He testified as follows:

> **Q.** **So when he is about to ejaculate does he insert his penis into your mouth.**
> **A.** **Yes.**
> **Q.** **So ultimately you had to open your mouth to accept the penis that was going to go in there. Is that not true?**
> **A.** **Yes, it was a matter of seconds.**
> **Q.** **You could have kept your mouth shut. Correct?**
> **A.** **I know.**
> **(Medina Depo, p. 133, l. 8-17).**

---

[7] According to Medina's deposition testimony, the first incident occurred by early-2002. He did not file a Charge of Discrimination until July 2004, making it untimely as to the first incident, particularly in light the year long break in his employment. **(SOF ¶ 27)**

CASE NO. 08-22111-CIV COOKE/BANDSTRA

As to the third incident, Medina claims that Rev. Ike masturbated himself while Medina massaged him.  Rev. Ike never touched Medina during this alleged incident. **(SOF ¶ 39)**

Medina does not remember the details of any of the other alleged batteries.  **(SOF ¶ 40)**

These allegations—while blatantly false and completely inconsistent with his original Charge of Discrimination—do not constitute battery.

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ("IIED"):**     A   claim   of IIED requires a plaintiff to establish "1) deliberate or reckless infliction of mental suffering by defendant; 2) by outrageous conduct; 3) which conduct of the defendant must have caused the suffering; and 4) the suffering must have been severe."  *Golden v. Complete Holdings, Inc.*, 818 F.Supp. 1495, 1499 (M.D.Fla.1993)(citing *Metro. Life Ins. Co. v. McCarson*, 467 So.2d 277, 278 (Fla. 1985)).  The conduct must be

> So outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.  Generally the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*McCarson*, 467 So.2d at 278-79 (citation omitted).  The court must decide whether a defendant's conduct meets this standard as a matter of law.  *Ayers v. Wal-Mart Stores, Inc.*, 941 F.Supp.1163, 1167-68  (M.D.Fla.1996)(citations omitted).   Significantly, "Florida courts have consistently rejected claims for intentional infliction of emotional distress relating to sexual harassment…." *Golden*, 818 F.Supp. at 1499.

Again, since no reasonable jury could possibly accept Medina's allegations of recurrent sexual battery or retaliation based the record evidence, summary judgment on IIED is warranted.  As detailed above, Medina clearly gave express or implied consent.

CASE NO. 08-22111-CIV COOKE/BANDSTRA

Further, His actions show that his suffering was not severe.  He continued working regularly after each of the alleged incidents.  **(SOF ¶ 28, 30, 33)**  He did not report the abuse to anyone and did not seek treatment for the abuse, and he claimed he would return to work for UCEA. **(SOF ¶ 2, 44)**.

Although Medina has alleged in his Fifth Amended Complaint that Rev. Ike required him to perform sexual acts as part of his job, this allegation is in direct conflict with his own sworn testimony.  In the Trial before Judge Graham, Medina testified unequivocally,

> **Q.**   **Did Reverend Ike ever convey to you the idea that you providing him with sexual pleasure was part of your job?**
> **A.**   **No, never.**
> **(Graham Trial, p. 43, l. 16-20)**

Thus, summary judgment should be granted in Defendants' favor on the IIED count.

**NEGLIGENT RETENTION/SUPERVISION:**  Negligent retention and negligent supervision require a showing that "during the course of employment, the employer becomes aware, or should have become aware, of problems with an employee that indicates his unfitness, and the employer fails to take further action such as investigation, discharge, or reassignment." *Samedi v. Miami-Dade County*, 134 F.Supp.2d 1320, 1352 (S.D.Fla.2001)(citation omitted).  To prevail on either claim, Medina must establish duty, breach, causation, and damages.  *Id.* at 153.  Further, "the underlying wrong allegedly committed by an employee in a negligent supervision or negligent retention claim must be based on an injury resulting from a tort which is recognized under common law."  *Scelta v. Delicatessen Support Servs., Inc.*, 57 F.Supp.2d 1327, 1348 (M.D.Fla.1999).

Since no reasonable jury could believe Medina's underlying tort claims of battery and IIED, his claim for negligent retention/supervision must also fail.

CASE NO. 08-22111-CIV COOKE/BANDSTRA

Further, there is absolutely no evidence in the record to support Plaintiff's allegation that UCEA possessed the requisite knowledge of unfitness because of a prior allegation of sexual misconduct.  Here, the only basis of knowledge cited by Medina is a prior claim by Andrew Brown, who made false allegations that Rev. Ike made sexual advances toward him.  **(11/19/01 Rev. Ike Aff.)**  When Andrew Brown procured a male prostitute whom he left alone with Rev. Ike, Rev. Ike talked to him about his family, his schooling, and going to church.  There were absolutely no sexual advances at all.  **(Alejandro Rubio Aff.)**  The case was settled for less than litigation costs.  **(Andrew Brown Settlement Stip.)**  Since there is no evidence that Andrew Brown's claims were meritorious, Medina has not established the requisite knowledge and summary judgment is proper.

**SEXUAL HARASSMENT:** Plaintiff asserts claims of sexual harassment under both Title VII and the FCRA.  Since the FCRA was derived from Title VII, decisions addressing sexual harassment under Title VII also apply to claims of sexual harassment under the FCRA.  *See Harper v. Blockbuster Entm't Corp.*, 139 F.3d 1385, 1387 (11th Cir. 1998).

> To establish a hostile-environment sexual-harassment claim under Title VII based on harassment by a supervisor, an employee must show:(1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)(citation omitted).  As to the second element, the proper inquiry is "whether [a plaintiff] by [his] conduct indicated that the alleged sexual advances were unwelcome, not whether [his] actual participation in sexual intercourse was voluntary."  *Meritor Sav. Bank, FSB v. Vinson, 447* U.S. 57, 68 (1986).  Also, to

CASE NO. 08-22111-CIV COOKE/BANDSTRA

be actionable, harassment must be both subjectively and objectively severe and pervasive. *Johnson v. Booker,* 234 F.3d 501, 509 (11th Cir.2000). Harassment is subjectively severe and pervasive "if the complaining employee perceives the harassment as severe and pervasive." *Id.*

Medina's false claims of sexual battery cannot form the basis of a sexual harassment claim. Medina has not presented a single shred of evidence other than his own false testimony that these incidents occurred. Both Spengler and Ortiz were at UCEA every day and did not observe a hint of sexual harassment. **(SOF ¶ 41)**. Should the Court accept that any sexual acts occurred, Defendants submit that the only plausible inference is they were welcomed by Medina in furtherance of this extortionate scheme and are therefore not actionable.

Further, the record evidence conclusively establishes that Medina did not subjectively perceive the harassment as severe and pervasive. Medina acknowledged he could have left UCEA whenever he wanted and promptly obtained employment earning comparable income. **(SOF ¶ 52)** Following the first alleged incident, he continued working regularly for several months. **(SOF ¶ 28)** He opted to return to UCEA in July 2003, knowing he could have obtained alternative employment. **(Medina Depo, p. 84, l. 3-7)** Despite six or seven more alleged batteries, Medina continued to work until April 2004, when he finally stopped working after failing to pick up Rev. Ike from the airport. **(SOF ¶ 33)** Medina even filed a related federal case asserting that he wishes to return to work for UCEA. **(SOF ¶ 44)** Further, he never sought counseling or treatment for the alleged abuse. **(SOF ¶ 2)**

Moreover, UCEA has established the *Ellerth-Faragher* defense. An employer that exercises reasonable care to prevent and correct sexually harassment can avoid liability where an employee unreasonably fails to take advantage of a preventative or corrective opportunities

provided by the employer or to avoid harm otherwise. *See Howard v. City of Robertsdale*, 168 Fed.Appx. 883, 887 (11th Cir. 2006). UCEA published a comprehensive sexual harassment policy which Medina unreasonably failed to utilize. **(SOF ¶ 28)**. The policy was hanging on Ortiz's bulletin board in the office where Medina worked every day. Medina failed to timely report the alleged harassment. On this basis alone, UCEA is entitled to summary judgment.

## RETALIATION:

**A. Medina Failed to Timely Exhaust Administrative Remedies:** "Prior to filing a Title VII/FCRA action, a plaintiff first must exhaust his administrative remedies by filing a charge of discrimination with the EEOC/FCHR." *Joseph v. Florida Quality Truss Industries, Inc.*, 2006 WL 3519095 *8 (S.D.Fla.2006)(citation omitted). "A plaintiff's judicial complaint is limited by the scope of the EEOC/FCHR investigation that can reasonably be expected to grow out of the charge of discrimination. *Id.* (quotation and citation omitted).

In Medina's July 2004 Charge of Discrimination, his sole claim of retaliation was that he was terminated but rehired "about a month later". Since he claims he was terminated around July 2002, this claim was untimely, having been filed more than a year later. **(SOF ¶ 45-46)** The remaining allegations of retaliation in the Fifth Amended Complaint pertain to his work conditions. They were never submitted to the EEOC and therefore are invalid.

**B. Plaintiff Fails to Establish a Genuine Issue of Material Fact:** In order to establish a prima facie case of retaliation under either Title VII or the FCRA, a plaintiff must show: (1) a statutorily protected expression; (2) an adverse employment action; and (3) a causal connection between the participation in the protected expression and the adverse action. *Hinton v. Supervision Intern, Inc.*, 942 So.2d 986 (Fla. 5th DCA 2006); Fla. Stat. §760.10(7).

CASE NO. 08-22111-CIV COOKE/BANDSTRA

To establish an adverse employment action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse" such that "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 So.Ct. 2405, 165 L.Ed.2d 345 (2006). Title VII does not protect employees from "those petty slights or minor annoyances that often take place at work." *Id.*

As noted above, Medina was never terminated and he admitted that Rev. Ike never told him sex was part of his job. Also, since Medina never objected to the alleged harassment, there was no statutorily protected expression. **(SOF ¶ 28, 35)** Fundamentally, Medina's allegations of retaliation are patently false. There was no adverse employment action. Spengler went to UCEA every day and observed that Rev. Ike treated Medina the same as all the other employees. **(SOF ¶ 51)** No person could believe Medina would have endured the alleged retaliation when he knew he could have obtained suitable alternative employment. **(SOF ¶ 53)** Finally, if the conditions were so intolerable, Medina would not have referred his close friend to work for Rev. Ike and he would not have alleged he wants to return to UCEA himself. **(SOF ¶ 43, 44)**

## CONCLUSION

The record in this case clearly establishes that Medina's claims of recurrent sexual battery and retaliation are part of an extortionate scheme by him and Ortiz. Since his story is so utterly contradicted by the record so that no reasonable jury could believe it, there are no genuine issues of material fact to be tried. Defendants respectfully request that this Honorable Court enter final summary judgment in their favor and against Medina on all counts.

Dated: May 14, 2009

CASE NO. 08-22111-CIV COOKE/BANDSTRA

Respectfully submitted,

**/s/ Richards H. Ford**
Richards H. Ford (Florida Bar No. 288391)
E-mail address: rford@wickersmith.com
WICKER, SMITH, O'HARA, MCCOY & FORD, P.A.
Post Office Box 2753
Orlando, FL 32802-2753
Telephone: (407) 843-3939
Facsimile: (407) 649-8118
Attorney for Defendants

CASE NO. 08-22111-CIV COOKE/BANDSTRA

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2009, I electronically filed the foregoing document with the Clerk of Court using CM/ECF.  I also certify that the foregoing document is being served on this day on all counsel of record identified in the attached Service List via transmission of Notice of Electronic Filing generated by CM/ECF.

**/s/ Richards H. Ford**
Richards H. Ford (Florida Bar No. 288391)
E-mail address: rford@wickersmith.com
WICKER, SMITH, O'HARA, MCCOY & FORD, P.A.
Post Office Box 2753
Orlando, FL 32802-2753
Telephone: (407) 843-3939
Facsimile: (407) 649-8118
Attorney for Defendants
[United Christian Evangelistic Association of Florida, LLC, United Christian Evangelist Association of Florida, Inc. United Christian Evangelist Association, Inc. Frederick "Ike" Eikerenkoetter]

CASE NO. 08-22111-CIV COOKE/BANDSTRA

## SERVICE LIST

**MEDINA V. UNITED CHRISTIAN EVANGELISTIC ASSOCIATION OF FLORIDA,
LLC, et al.
CASE NO. 08-22111-CIV-COOKE/BANDSTRA
United States District Court, Southern District of Florida**

Jennifer Ator, Esquire
E-mail address: jja@hankinsator.com
HANKINS & ATOR, PL
371 North Royal Poinciana Blvd.
Miami Springs, FL 33166
Telephone: (305) 863-8525
Facsimile: (305) 863-8535
Attorneys for Plaintiff
[Augusto Medina]
Via transmission of Notice of Electronic Filing
generated by CM/ECF

Eugene I. Farber, Esquire
E-mail address: efarber747@aol.com
Farber, Pappalardo & Carbonari
200 East Post Road
White Plains, NY  10601
Telephone: (914) 761-9400
Facsimile: (914) 761-0747
Co-counsel for Defendants
Via transmission of Notice of Electronic Filing
generated by CM/ECF